IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

|  |  |
|---|---|
| C2R Global Manufacturing, Inc., | Case No. 18-30182-beh |
| Debtor. | Chapter 11 |

Verde Environmental Technologies, Inc.
d/b/a Verde Technologies,

|  |  |
|---|---|
| Plaintiff, | Adversary No. 20-02028-beh |
| v. | |
| C2R Global Manufacturing, Inc., | |
| Defendant. | |

## DECISION ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Verde Environmental Technologies, Inc. ("Verde") seeks a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, to enjoin the defendant-debtor, C2R Global Manufacturing, Inc. ("C2R"), its direct competitor in the drug disposal market, from engaging in allegedly false and misleading advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and an order requiring corrective advertising. For the reasons that follow, the motion will be denied.

### BACKGROUND

On October 29, 2018, C2R filed a petition for relief under Chapter 11 of the Bankruptcy Code. Previously, on March 16, 2018, Verde filed a lawsuit against C2R in the U.S. District Court for the Eastern District of Wisconsin,

asserting claims for false advertising as well as claims for infringement of two of its patents. After the debtor filed its bankruptcy petition, the litigation in the district court was stayed. Verde timely filed a proof of claim for $6,821,918.00, claiming the damages asserted in its district court complaint. ECF Proof of Claim No. 6.[1] C2R objected to the claim. ECF Doc. No. 57. After a *Markman* hearing and decision, the parties settled their patent claims. ECF Doc. No. 215.

On February 17, 2020, Verde filed the instant adversary proceeding, seeking permanent injunctive relief related to its remaining claims for false advertising under federal and state laws. On the same date, Verde filed a motion requesting a preliminary order enjoining C2R from false advertising and requiring corrective advertising. AP-ECF Doc. No. 7.[2] On May 18, 2020, the Court granted C2R's motion to dismiss Verde's claim under Wisconsin Statute § 100.18 for failure to state a claim upon which relief can be granted. AP-ECF Doc. No. 75. The Court now considers preliminary relief as to only the claim made under 15 U.S.C. § 1125(a).

The Court has jurisdiction under 28 U.S.C. § 1334 and the Eastern District of Wisconsin's July 16, 1984 order of reference entered under 28 U.S.C. § 157(a). To the extent that issues may be deemed non-core but otherwise relate to the debtor's bankruptcy case under Title 11, the parties

---

[1] Citations to the docket in the Bankruptcy Case No. 18-30182-beh are noted by "ECF Doc. No." Citations to the docket in the Adversary Proceeding No. 20-02028-beh are noted by "AP-ECF Doc. No."

[2] Specifically, Verde seeks a preliminary injunction ordering C2R to advise its customers "that the Rx Destroyer products will not fully deactivate drugs to the labeled capacity when used according to instructions." AP-ECF Doc. No. 7, at 1.

have given their express consent to the entry of appropriate orders and judgment by the bankruptcy court. AP-ECF Doc. No. 1, at ¶ 7, *Compl.*; AP-ECF Doc. No. 35, at ¶ 7, *Answer.*

Due to the health risk concerns arising from the COVID-19 pandemic, much of the witness testimony on this motion was submitted by declarations under penalty of perjury. Two expert witnesses supplemented their declarations with live testimony, via videoconferencing through Zoom.gov. Having considered the testimony and evidence presented at the two-day video hearing as well as evidence submitted via declaration, and weighing the parties' legal arguments, including their post-hearing submissions, the Court concludes that plaintiff Verde has not shown irreparable harm in the interim prior to final resolution, in part due to the length of time it took Verde to bring the instant motion after it first concluded C2R's advertising was false. Consequently, a preliminary injunction is not warranted. This opinion constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(2).

## STATEMENT OF FACTS

### A.    Verde and its product, Deterra

Verde is a Delaware corporation with its principal place of business in Minnetonka, Minnesota. *Compl.*, at ¶ 1. Verde develops solutions to reduce drug abuse, misuse, and negative environmental impact. AP-ECF Doc. No. 9, at ¶ 2, *Sundby Decl.* Among its products is Verde's Deterra Drug Deactivation System ("Deterra"). *Id.* The Deterra pouches or containers come in various sizes

and contain a proprietary activated carbon. *Id.* at ¶¶ 3, 5. After pharmaceuticals are placed into Deterra and water is added, they are adsorbed by the activated carbon, to render them inert and irretrievable. *Id.* at ¶ 7. As part of its product development contract with the National Institute of Drug Abuse, a division of the National Institute of Health, Verde submitted Deterra for independent testing by Mercer University's Department of Pharmaceutical Sciences. *Id.* at ¶¶ 8–9. The parties agree that at present, the U.S. Drug Enforcement Agency ("DEA") does not prescribe particular testing to determine deactivation capacity for products such as those made by Verde and by C2R. AP-ECF Doc. No. 27, at ¶ 34, *Mazyck Decl.*; AP-ECF Doc. No. 130, at 76:10–15, *Worthen testimony*.

**B.    C2R and its product, Rx Destroyer**

C2R is a Wisconsin corporation with its principal place of business in Burlington, Wisconsin. *Answer*, at ¶ 2. C2R manufactures products for chemical drug destruction, principally the Rx Destroyer line of products, which use a combination of liquid dissolving agent and activated carbon whereby pharmaceuticals begin dissolving on contact and active ingredients are adsorbed or neutralized by the carbon. *Id.*, at ¶ 14.

Milton Dallas is a founder and co-principal of C2R, and he testified that prior to initiating its Rx Destroyer line in early 2014, C2R had been manufacturing and selling the Drug Buster product for third-party Earth Ecocentric, LLC, since sometime in late 2011. *Dallas Depo.*, at 25:6–26:10 and

64:1–3.[3] Drug Buster was C2R's first effort in the drug deactivation business, and its first experience with pharmaceutical products or activated carbon. *Dallas Depo.*, at 25:16–21. Sherry Day, a registered nurse and principal of Earth Ecocentric, had obtained a patent purportedly covering the Drug Buster device. *Answer*, ¶ 24; AP-ECF Doc. No. 26-12, Wilbert Exhibit 12, *Patent No. US 7,918,776 B2.* Day was the one to determine the adsorption capacities for the Drug Buster products, and she then relayed them to C2R. *Answer*, at ¶ 25. Dallas was not aware of any specific testing relating to the capacity of the Drug Buster product, suggesting that C2R relied on Day's representations. *Dallas Depo.*, at 66:21–68:3. But another of C2R's officers, Russ Robers, testified that C2R performed its own testing on Drug Buster's capacity in 2011, to test various quantities of aspirin pills as to whether they would "dissolve" in the different-sized bottles. AP-ECF Doc. No. 24-7, Wilbert Exhibit 13, *Robers Depo.*[4]

When designing its Rx Destroyer product line, C2R designed around the Day patent by removing the surfactant that was included in the Drug Buster

---

[3] Dallas's deposition testimony originally was filed by Verde under seal at AP-ECF Doc. No. 5, Lorentz Exhibit 1. C2R filed excerpts from the same transcript both under seal at AP-ECF Doc. No. 24-6, Wilbert Exhibit 11, and in redacted form at AP-ECF Doc. No. 26-11, Wilbert Exhibit 11. The parties later agreed that additional portions of this testimony did not warrant protection from disclosure, and thus did not need to remain sealed. *See* AP-ECF Doc. No. 122. The portions of the testimony cited in this opinion are those that the parties have agreed is subject to public disclosure, and will be referred to collectively as *Dallas Depo.*

[4] Robers' deposition testimony originally was filed by C2R under seal at AP-ECF Doc. No. 24-7, Wilbert Exhibit 13. But C2R waived that pre-trial protection by describing the details of Robers' testimony in its publicly-filed response brief. AP-ECF Doc. No. 25, at 9. *See Video Software Dealers Assoc. v. Orion Picture Corp. (In re Orion Picture Corp.)*, 21 F.3d 24, 28 (2d Cir. 1994) (applying 11 U.S.C. § 107(b) to find waiver of confidentiality as to discrete items disclosed, but not as to remaining undisclosed communication on same subject matter).

product. *Answer*, at ¶ 27; *Dallas Depo.*, at 199:11–16. Because the Rx

Destroyer product differed from Drug Buster only as to the surfactant, but not

the activated carbon, C2R concluded that Rx Destroyer would have the same

approximate capacity as Drug Buster. *Dallas Depo.*, at 66:21–68:18; AP-ECF

Doc. No. 24-18, Wilbert Exhibit 26, *Feb. 11, 2014 e-mail.*[5]

C2R has a website dedicated to the Rx Destroyer line of products,

www.rxdestroyer.com, and represents that Rx Destroyer all-purpose products

can be used with all non-hazardous medications, including pills, capsules,

tablets, liquids, lozenges, transdermal patches, fentanyl lollipops, and

suppositories. AP-ECF Doc. No. 8, Lorentz Exhibit 2, *How to Use*; AP-ECF Doc.

No. 26-9, Wilbert Exhibit 9, *How to Use* (collectively hereinafter, *How to Use*).

The website provides the following instructions on product use:

### Rx Destroyer™ ALL-PURPOSE Formula Directions

1. Load medications into the bottle*
2. Tightly replace cap
3. Gently shake to mix solution over medications
4. Store in a safe and secure location…use until full
5. Bottle is full when contents are within 2 inches from cap – DO NOT OVERFILL
6. Discard bottle and its contents into common trash or according to business process and regulations.
7. Always follow institutional policies, local, state, tribal and federal disposal regulations for compliance.

*Outer shell of capsules and patch material will NOT dissolve.

https://www.rxdestroyer.com/how-to-use/ (last visited October 6, 2020); *see

also How to Use*. The same website page includes the following "quick fact":

"Each [Rx Destroyer] container contains a carefully formulated balance of

ingredients that will destroy to medication capacity." *Id.*

---

[5] C2R originally filed this e-mail under seal, but counsel relied on it in its publicly-filed response brief. AP-ECF Doc. No. 25, at 9. *See supra* note 4.

At least until March 18, 2020, the website also described the deactivation capacity of C2R's Rx Destroyer all-purpose products as follows:

## CAPACITY BY PRODUCT

- 5 Gallon: holds approximately 15,000 pills/patches or 500 additional oz. of liquid
- 2.5 Gallon: holds approximately 7,500 pills/patches or 160oz. of liquid
- 1 Gallon: holds approximately 3000 pills/patches or 64oz of liquid
- 64oz: holds approximately 1500 pills/patches or 32oz of liquid
- 16oz: holds approximately 300 pills/patches or 8oz of liquid
- 4oz: holds approximately 50 pills

https://www.rxdestroyer.com/how-to-use/ (last visited March 18, 2020)

*Answer*, at ¶ 20; *see also How to Use*. In addition, at least as of March 18, 2020, the Frequently Asked Questions page of the Rx Destroyer website included the following:

Q: What is the capacity of Rx Destroyer™ All-Purpose?

A1: RX4 (4oz) approximately 50 pills
A2: RX16 (16oz) approximately 300 pills
A3: RX64 (64oz) approximately 1,500 pills
A4: RX1.0PRO (1 Gallon) approximately 3,000 pills
A5: RX2.5 (2.5 Gallon) approximately 7,500 pills
A6: RX5 (5 Gallon) approximately 15,000 pills
A7: RX30 (30 Gallon) approximately 90,000 pills

Notes:
1) Capacity based upon 200mg Advil™ tablet
2) Do not overfill Container; Container considered full when within 2" of opening
3) Additional fluid variance between sizes due to bottle profile
4) Capacity will vary if solids are introduced

https://www.rxdestroyer.com/faq-page/ (last visited March 18, 2020)

*Answer*, at ¶ 20; AP-ECF Doc. No. 8, Lorentz Exhibit 2, *Q & A Page*; AP-ECF Doc. No. 26-10, Wilbert Exhibit 10, *Q & A* (collectively hereinafter, *Q & A Page*).

Verde is primarily contesting, in both its complaint and motion for preliminary injunction, the capacity representations above that expressly identify the number of pills per container. At some point between March 18, 2020 (when, as indicated above, counsel for C2R last accessed the website pages representing the Rx Destroyer's capacity on a per-pill basis), and early April 2020, C2R revised its website and removed those representations. *See* AP-ECF Doc. No. 66, at 4; AP-ECF Doc. No. 67, at 4; AP-ECF Doc. No. 130, at 8:18–9:1, 19:2–13, 136:23–139:18. C2R's website, however, still includes the directive that Rx Destroyer containers can be filled until contents are two inches from the cap, and Verde maintains that this is a false representation as to capacity that should be enjoined. *See* AP-ECF Doc. No. 130, at 8:18–9:12, *Verde's Opening Statement*; AP-ECF Doc. No. 131, at 21:14–23:7, *Verde's Closing Argument*.

## C. C2R's Scientific Analysis

Between early 2014, when C2R started producing the Rx Destroyer product, through early 2015, C2R continued to use the same approximate capacities for the Rx Destroyer as it had used for the Drug Buster product. *Dallas Depo.*, at 66:21–68:18. In 2015, C2R retained Dr. Henry Nowicki, an activated carbon expert with experience in toxicology. *Answer*, at ¶ 28. Although Nowicki did not have training or experience analyzing pharmaceutical deactivation, he was retained to review (1) testing results from C2R's

competitors' products, including Verde's, (2) recent DEA regulations,[6] and (3) existing C2R product claims about Rx Destroyer, and then determine how and what tests should be performed. *Dallas Depo.*, at 93:2–94:11; AP-ECF Doc. No. 130, at 47:21–48:10, *Worthen testimony*; AP-ECF Doc. No. 115, at 2, *Jan. 19, 2015 e-mail.*

Nowicki prepared two reports for C2R. The first, dated February 19, 2015, was a "GAED" test summary of an activated carbon used in the Rx Destroyer product. AP-ECF Doc. No. 11, at 56, Worthen Exhibit C. GAED, or Gravimetric Adsorption Energy Distribution, assesses pore location and performance of substances like activated carbon. Essentially, Nowicki used the GAED, or energy distribution map of C2R's activated carbon, and also applied a formula, the Michael Polanyi Equation, to achieve what he termed the full characterization of the physical adsorption space for the particular carbon material he studied. By this energy mapping and equation application, Nowicki concluded that, for this carbon, the Rx Destroyer "is designed to provide enough pore volume to provide complete adsorption and thus non-retrievable drugs destruction for practical purposes." *Id.* He also reviewed studies that C2R sent him, authored by Dr. David Cooney, Dr. William Fowler of Verde, Dr. Signid Peldszusl and Dr. Bert McCarty, and reasoned that there was no need to

---

[6] AP-ECF Doc. No. 26-14, Wilbert Exhibit 14, *Disposal Regulations: Registrant Fact Sheet.* According to the fact sheet provided to Nowicki, the new DEA regulations, as of October 2014, would allow authorized manufacturers, distributors and others to collect pharmaceutical controlled substances from ultimate users by administering mail-back programs and maintaining collection receptacles, among other features. The new regulation was codified at 21 C.F.R. § 1300–17. *Id.*

reproduce those results as "the data in these studies can be applied to the activated carbon [from C2R]. Due to the enormous numbers of present medications in the marketplace and new drug developments, it would not be practical to test the adsorption capacity and rate of adsorption for each specific drug." *Id.*

Nowicki's second report to C2R was dated April 29, 2015. AP-ECF Doc. No. 11, at 60, Worthen Exhibit D. It contained his analysis of the adsorptive pore volume available in each size of Rx Destroyer to take up drugs from water. He assumed either 5 mg or 30 mg active drug per pill, referring to "drugs of interest," and assumed 50 pills for the 4 oz. size, 300 pills for 16 oz. size, 1500 pills for the 64 oz. size, and 7500 pills for the 2.5-gallon size. *Id.* He concluded that there was a safety margin of excess pore volume in each product size. *Id.* Nowicki's April report also stated:

> Used carbon in small amounts are disposed thru normal solid waste handling procedures. Amounts of activated carbon in Rx Destroyer bottles are considered small. The EPA basis for this small amount of used carbon disposal is based on passing the TCLP test. Toxicity Characteristic Leaching Procedure (TCLP) test provides confidence that carbon adsorbates will not leach off to contaminate ground water. . . . Carbon is well known to hold adsorbates tightly and not leach off by water.

*Id.* Other aspects of the April report were a repeat of the February report.

C2R quotes from a portion of Nowicki's analysis on its website at the "Test Data" page, and provides links to his reports. *See* https://www.rxdestroyer.com/test-data/ (last visited October 6, 2020).

**D.    Verde's Testing of Rx Destroyer**

As soon as C2R began producing the Rx Destroyer line in 2014, Verde began tests of its competitor's product's capacity. In June and July of 2014,[7] October of 2016, March through April of 2018, and July of 2019, William Fowler, Verde's Director of Research and Development, examined the contents of Rx Destroyer products and conducted a number of capacity tests. AP-ECF Doc. No. 10, at ¶¶ 3–19, *Fowler Decl.* He added specific drugs or a combination of drugs to the product, mixing the solution by inverting, shaking, or placing the product on a rocker, and analyzing the contents after a period of days using UV-Vis spectrophotometry. *Id.* In several instances, he conducted an analysis of the Rx Destroyer bottle contents, removing, drying and weighing the carbon, and calculating the fluid content. *Id.* at ¶¶ 8–9, 19.

From his experiments, which yielded at most a 30% adsorption rate, Fowler concluded that:

> Rx Destroyer's products are incapable of deactivating
> medications up to their capacity claims. The Rx
> Destroyer 4 oz. bottle, which purportedly has a

---

[7] Verde first accused C2R of false advertising in June 2014, when it sent a demand letter alleging that eleven claims C2R had made on its website about the Rx Destroyer's effectiveness and functionality were false or misleading, or disparaged Verde's product Medsaway (the brand name Verde used before adopting "Deterra"). AP-ECF Doc. No. 26-1, Wilbert Exhibit 1, *June 2, 2014 letter*. In fact, several of the C2R website statements in 2014 asserted, as the letter describes, negative comparisons with the Medsaway product: "The Rx Destroyer is 'professional' while the Medsaway product sold by Verde is not." "The MSDS for Rx Destroyer indicates that the product is 'safe' while Medsaway is not." Verde's cease-and-desist letter noted that C2R's website statements suggested it had scientific studies to back up its statements and implied claims but failed to cite any such evidence, and Verde believed there was no such information.

There is no response letter from C2R in the record, nor any testimony about C2R's formal response to this letter, if indeed there was one. There is no dispute, however, that C2R made changes to its website at some point thereafter so as to remove the comparative statements about Verde's product and to add the citation to the Nowicki analysis.

> capacity of 50 pills or tablets, only deactivated 8.4
> tablets of quetiapine, 19.2 tablets of tramadol, 19.2
> tablets of meperidine, and 3.7 tablets of Advil. The Rx
> Destroyer 16 oz. bottle, which purportedly has a
> capacity of 300 pills or tablets, only deactivated 105
> tablets of Naproxen, 7.6 tablets of acetaminophen, and
> 13.3 tablets of Advil. Given that publicly available
> materials show similar or lower ratios of activated
> carbon for the larger Rx Destroyer products, I expect
> the results would be similar for the larger Rx Destroyer
> products as well.

*Id.* at ¶ 20. He also described his testing and observations that the Rx Destroyer contains substantially less carbon than was assumed by Nowicki, as reported in Nowicki's April 29, 2015 memorandum. *Id.* at ¶ 21.

Verde also retained Dr. David Worthen, a scientist with experience in pharmaceuticals, to review Nowicki's materials. First, he pointed out that Nowicki relied on only generalized references, and not the precise performance of activated carbon in the Rx Destroyer. AP-ECF Doc. No. 11, at ¶ 15, *Worthen Decl.* Second, he recognized that Nowicki's analyses of the Rx Destroyer were based only on theoretical modeling, and that Nowicki and his lab did not conduct actual testing of the product. *Worthen Decl.*, at ¶ 16. In other words, none of Nowicki's analyses included actual testing of Rx Destroyer products by placing medications into the various product sizes and later measuring to determine how much of the drug component the carbon adsorbed or deactivated. Nowicki's testing and analysis was referential and theoretical. *Worthen Decl.*, at ¶¶ 14–17, *Worthen Decl.* Last, Worthen concluded that Nowicki's assumptions, on which C2R relied for its capacity claims, were unreasonable as they relate to tablet size, tablet content, and adsorption

science. *Worthen Decl.*, at ¶ 17. More specifically, Worthen considered that the carbon reference material Nowicki consulted would have nothing to do with the performance of the particular Rx Destroyer products and their deactivation capacity. They simply show that activated carbons can or may be used to adsorb certain materials under certain circumstances. *Id.* at ¶¶ 15, 23–27.

Worthen's declaration was more detailed in explaining why Nowicki's theoretical modeling was deficient, and incapable of supporting C2R's capacity claims. He described that activated carbon, when confronted with a mix of complex chemicals such as those that might be placed in an Rx Destroyer container, cannot be precisely predictable as to which molecules will be adsorbed. *Id.* The Polanyi equation Nowicki used can suggest possible adsorption outcomes, but does not yield the true drug capacity of the particular activated carbon as would actually placing medications into the carbon-containing bottle (Rx Destroyer product). *Id.* at ¶¶ 19–20. In Nowicki's analysis of the theoretical pore volume, which he related to the adsorptive surface area of the specific activated carbon used in Rx Destroyer, Nowicki deemed the adsorptive capacity of the RX Destroyer carbon as equal to or better than a coal-based reference carbon. Worthen took particular issue with Nowicki's assumption that "most all of the drugs" (that would ever be placed into an Rx Destroyer product) "are high enough molar volume and low enough water solubility that they are readily adsorbed . . . ." Worthen deemed this volume and solubility assumption impossible, given the complex mix of drug products likely to be introduced. Worthen described not only the active drug

ingredients but the other components which would be competing for activated carbon binding sites, and materially affect actual performance. Therefore, the theoretical model was not a reasonable basis to support C2R's claims. *Id.* at 21–39.

In short, Worthen opined that none of the 2015 Nowicki materials on which C2R relies to support the capacity representations on its website reasonably support those representations. *Worthen Decl.*, at ¶ 55.

## E. C2R Tests in Response to Verde's Testing

After Verde filed suit in 2018, C2R then commissioned independent testing by Dr. David Mazyck, another activated carbon expert. According to his March 2, 2020 declaration, Mayzck conducted two experiments with the 16 oz. Rx Destroyer, one where he added 300 pills of generic ibuprofen at 200 mg to the bottle and one where he added 300 pills of 200 mg Advil to the bottle. AP-ECF Doc. No. 27, at ¶¶ 24–31, *Mazyck Decl.* He applied a similar test method as used by Fowler, but found that the Rx Destroyer deactivated 90-99% of the pills in his experiments. *Id.* Based on his own results, C2R's reliance on the Day patent,[8] and Nowicki's testing, Mazyck concluded C2R's capacity representations are as advertised. *Id.* at ¶¶ 17, 24–26, 41.

In particular, Mazyck opined that Nowicki's methodology is a reliable method for assessing the potential capacity for adsorption of an unpredictable

---

[8] Mazyck reviewed the Day patent's disclosure, which stated "for every ounce of medicine(s) to be destroyed, this embodiment uses one half ounce (1/2 oz.) activated carbon, two-thirds of an ounce (2/3 oz.) dishwashing liquid, and one ounce (1 oz.) of distilled vinegar." Based on this disclosure, Mazyck concluded the Day patent is stating that the preferred mass ratio of medicine to carbon is 6:1. *Mazyck Decl.*, ¶ 17; AP-ECF Doc. No. 26-12.

combination of medications. *Id.* at ¶ 41. He read Nowicki's analysis to mean that there is at least twice the carbon present in the 16 oz. Rx Destroyer container than required for deactivation. *Id.* at ¶ 44. Moreover, Mazyck's own testing (of three-hundred 200 mg Advil pills) compared to the Nowicki analysis, suggested that C2R now—at least when Mazyck did his testing—uses a different activated carbon in its Rx Destroyer line, which has more total pore volume and more capacity for drug adsorption. *Id.* at ¶ 46.

In his declaration, Mazyck was critical of one of the Fowler tests for not using a standard curve, but Fowler resolved that criticism in his own third declaration, concurring with Worthen's testimony regarding spectrophotometry and the light absorption by different chemical concentrations. AP-ECF Doc. No. 113, at ¶¶ 3–6, *Fowler Third Decl.* In Mazyck's view, Fowler's results do not allow one to draw conclusions. Instead, Mazyck relied on the documentation from Nowicki, Sherry Day, and his own experimentation to confirm C2R's capacity claims. AP-ECF Doc. No. 130, at 144:4–11, *Mazyck testimony*.

In Mazyck's supplemental declaration, he states that there are other mechanisms, beside carbon adsorption, in Rx Destroyer solution that deactivate drugs. AP-ECF Doc. No. 62, at ¶¶ 5, 17, *Mazyck Supp. Decl.* Worthen, in contrast, notes that C2R's website statements attribute the deactivation processes only to the activated carbon present in the Rx Destroyer containers. AP-ECF Doc. No. 130, at 43:4–46:5, *Worthen testimony*. Mazyck also asserted that it is nearly impossible for a drug user to retrieve drugs from the Rx Destroyer containers for diversion purposes. He considered that in his

experiment, the pills were completely dissolved and the mixture was 100%

homogenous, and that the activated carbon had adsorbed the ibuprofen. *Id.* at

¶ 13. Mazyck considered that it was reasonable for C2R to rely on the

conclusions of Nowicki, particularly when they were consistent with what C2R

understood from the Sherry Day patent. *Id.* at ¶ 15.

**F.     Verde's Response to C2R's Testing**

In addition to analyzing Nowicki's results, Worthen also critiqued the

Mazyck testing. AP-ECF Doc. No. 45, *Worthen Second Decl.* He recognized

Mazyck's conclusion as limited to deactivation capacity of 200 mg Advil tablets,

and disagreed that Rx Destroyer has sufficient capacity to achieve that. *Id.* at

¶ 2. The three bases on which Mazyck found C2R's capacity representations

reasonable included his reading of the Day patent to disclose a preferred

"medicine to carbon" ratio of 6:1; because Rx Destroyer products have a

"medicine to carbon ratio" of 2:1, Mazyck concluded the capacity

representations are reasonable. *Id.* at ¶ 4. Worthen deemed this rationale

flawed, because the Day patent included no reliable scientific evidence to

conclude a 6:1 medicine to carbon ratio would perform as intended. *Id.* at ¶¶ 3–

4. Worthen faults Mazyck's reliance on the Nowicki analyses, in part because

they contradict the 200 mg Advil results. *Id.* at ¶ 5. Worthen's last major

critique is of Mazyck's testing methodology, including his filtering out of

material that included drug residue, which improperly altered the drug

deactivation conclusion, and his technique of constant agitation, which does

not reasonably approximate the real-life use of the product (and C2R's product

use instructions). *Id.* at ¶ 20. Worthen questioned why Mazyck's endorsement of the reasonableness of Nowicki's theoretical analysis didn't highlight an inconsistency with his own, much more favorable deactivation results. *Id.* at ¶¶ 5–24.

Additionally, Fowler submitted a second declaration to critique the Mazyck testing. AP-ECF Doc. No. 44, *Fowler Second Decl.* He views the filtration method Mazyck employed as flawed, removing active drug from the sample and artificially inflating the calculation of deactivation capacity. *Id.* at ¶¶ 14–19. Fowler's third declaration reiterated aspects of Worthen's critiques of Mazyck's testing, particularly that his filtering method left drug material in the residual "paste," improperly inflating Mazyck's deactivation or adsorption percentage, and flaws in his equipment set-up. AP-ECF Doc. 113, at ¶¶ 9, 8, 12–18, *Fowler Third Decl.* Fowler added that the Nowicki theoretical analysis failed to account for the fact that drug components other than the active ingredient will compete for adsorption space. *Id.* at ¶ 11.

## G. Testimony on "Market Harm" to Verde and others

Jason Sundby has served as Chairman and CEO of Verde since 2015 and asserts that he "commonly interacts with customers and others in the marketplace." *Sundby Decl.*, at ¶ 1. Based on that market experience, he testified that "customers rely and depend on drug deactivation products to actually deactivate the pills and tablets that the products are advertised as being able to deactivate." *Id.* at ¶ 12. Further, Sundby asserts that his research shows that "if unused drugs are tossed in the trash, they risk being

inadvertently diverted by neighbors, children or pets," and that the "toilet flushing of drugs is now also discouraged, owing to environmental contamination risk to the nation's watershed." *Id.* at ¶ 15 (citing to JoNel Aleccia, *Dangerous drug patches pose overlooked risk to kids*, NBC.com (Aug. 11, 2011 at 8:31:55 ET); Matthew Grissinger, *Fentanyl transdermal patches: More protection needed for patients and their families*, 34 MEDICATION ERRORS 7 (July 2009)). He testified that unused medications which remain accessible in the home also pose safety hazards, as access to pharmaceutical drugs is a key contributor to drug diversion and abuse. *Sundby Decl.* at ¶ 17. Sundby stated that "[i]f not deactivated, undestroyed drug ingredients remain available for accidental or intentional diversion, and present an ongoing risk of environmental contamination for products disposed of in landfills." *Id.* at ¶ 13.

According to Sundby, his interactions with customers and others in the marketplace helped him to develop some understanding of customer expectations. *Sundby Decl.*, ¶ 1. He testified as to marketplace effect of the allegedly false C2R statements, in light of his understanding of Fowler's testing results. *Id.* He asserted that customers purchase C2R's product over Verde's because the Rx Destroyer cost-per-pill appears lower due to C2R's capacity representations compared to its price point. *Id.* at ¶ 21. Additionally, he testified, based upon his observations, "the drug-deactivation market as a whole is harmed by C2R's continued misrepresentations regarding the Rx Destroyer product capacity. When the Rx Destroyer products do not successfully deactivate the alleged capacities of medications, the reputation of

the entire market is affected as customers lose faith that any products are capable of deactivating medications as advertised." *Id.* at ¶ 19. Sundby offered his opinion that "when C2R advertises a product using activated carbon that does not work as represented, that casts doubt on all products using activated carbon." *Id.*

Milton Dallas of C2R conceded that he has "encountered Deterra as a competitor" through selling the Rx Destroyer line of products, but added that Deterra is not C2R's primary competitor for that product, and described it as "rare" to hear the name Deterra in the markets that C2R approaches to sell its Rx Destroyer line. *Dallas Depo.*, at 48:20–49:5 and 49:12–50:1. Dallas acknowledged that at least for some customers, the fact that Rx Destroyer has a larger capacity is a competitive advantage over Deterra, or over anything else on the market. *Dallas Depo.*, at 207:2–22. According to Dallas, C2R has published or advertised Rx Destroyer as being more affordable on a cost-per-pill basis. *Dallas Depo.*, at 198:13–16. Dallas felt customers may consider other aspects of its product as advantages, as well. *Dallas Depo.* at 207:2–22.

Shortly before the Court held its evidentiary hearing, both parties submitted declarations from certified public accountants addressing their opinions as to whether Verde has sustained financial damage from C2R's advertising and whether that damage is capable of dollar quantification. *See* AP-ECF Doc. Nos. 61, *Britven Decl.* and 85, *Gorowsky Decl.* Thomas Britven, C2R's expert, opined that Verde's damages were merely financial and not irreparable. For example, he asserted that there is a lack of meaningful

customer overlap, noting that Verde does not offer product data sheets that are required by many hospitals, and thus cannot sell to those entities, while C2R does provide such data sheets and has such hospitals as customers. *Britven Decl.*, at ¶ 20. He opined that, should C2R be liable for false advertising, the economic impact to Verde could be quantified using "well accepted economic damage and remedy models and analyses." *Id.* at ¶ 26. Britven contended that Verde's claim of injury is inconsistent with its financial performance—he stated that a "dramatic increase in revenue" (such as he considers Verde to have had) "is highly inconsistent with the financial performance of a company that is suffering 'irreparable injury to its revenues,'" and opined that Verde's revenue growth suggests significant marketplace success and new customers. *Gorowsky Decl.*, at ¶ 28 (quoting portions of *Britven Decl.*, at ¶¶ 11–13).[9] Britven asserted that Verde has enjoyed faster growth and higher annual revenues than C2R during the relevant time period and estimated that if false advertisements were affecting customer decisions and diverting sales, "one would expect to see" C2R outpace Verde. *Id.*

In contrast, David Gorowsky, Verde's financial expert, assumed liability and reached the conclusion that Verde's harm is irreparable, absent

---

[9] Britvens' declaration originally was filed under seal by C2R, accompanied with a publicly-available redacted version, as were a number of documents in this case. *Compare* AP-ECF Doc. Nos. 58 *with* 61. Likewise, Gorowsky's declaration was originally filed under seal by Verde, accompanied with a publicly-available redacted version. *Compare* AP-ECF Doc. Nos. 81 *with* 85. Where the Court relies on the publicly-available Gorowsky declaration, it is because Britven's declaration is being quoted without redactions. *See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 631 F. Supp. 2d 1010, 1016 n.2 (N.D. Ill. 2009) (explaining that the minor edits made by the court to avoid disclosure of sealed trade secrets would not reduce the transparency for the rationale of the decision).

preliminary injunctive relief. *Gorowsky Decl.*, at ¶¶ 13–14. He disputes Britven's conclusion that Verde's mere production of financial documents in discovery, which "enable partial quantification of Verde's damages," equates to an adequate remedy at law and no present need for injunctive relief. *Id.* at ¶ 17. He makes the point that no one can offer records of sales which did not occur for Verde as the result of C2R's advertising, yet those never-achieved sales are a meaningful harm. *Id.* at ¶¶ 18, 26. Gorowsky acknowledges that Verde generated increased revenues and profit margins during the time C2R employed the challenged advertising, but contends the efforts generating those results do not negate that harm was occurring. *Id.* at ¶ 19. Verde provided Gorowsky with a chart showing twenty-five customers to which both Verde and C2R sell.[10] He noted that the group includes twelve healthcare providers and eight distributors, many of which sell to healthcare facilities. *Id.* at ¶ 38. In Gorowsky's view, regardless of the amount of sales to each customer, the fact of overlap in customers reflects that the parties have been regularly competing for the same business in the relevant time period. *Id.* at ¶ 21. Gorowsky notes—and says Britven ignores—that the entire market for drug disposal products offered by these parties "dramatically increased during the 2015-2019 period." *Id.* at ¶ 30. He also faults Britven for ignoring that the customer overlap means that if C2R had not falsely advertised, there would have been a

---

[10] Verde originally filed this chart under seal, but counsel relied on its general parameters in Gorowsky's publicly-filed declaration. AP-ECF Doc. No. 40, Lorentz Second Exhibit 1. *See supra* note 4.

decrease in those sales to C2R and necessarily an increase in sales to Verde. *Id.* at ¶ 40.

## APPLICABLE LAW

### A.    Preliminary Injunctions

"A preliminary injunction is an extraordinary remedy." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). Indeed, it has been described as "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Indiana Civil Liberties Union Found., Inc. v. Superintendent, Indiana State Police*, No. 120CV01094JMSTAB, 2020 WL 3546018, at *6 (S.D. Ind. June 30, 2020) (internal quotation marks omitted) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008)). The purpose of a preliminary injunction is "to preserve the parties' positions until a trial on the merits can be held," and the party requesting the preliminary injunction "must generally show reasonable diligence." *Id.* (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Benisek v. Lamone*, __ U.S.__, 138 S. Ct. 1942, 1944 (2018) (holding that "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request")).

To determine whether such an extraordinary remedy is warranted, courts engage in a two-part analysis, which includes a "threshold phase" and a "balancing phase." *Girl Scouts*, 549 F.3d at 1085–86. In the threshold phase, the party seeking the preliminary injunction must show that: "(1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior

to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015). If the movant makes the required showing in the threshold phase, then the court proceeds to the second phase, and considers: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties"—in other words, the public interest. *Id.* at 662. It is a comparative assessment between the two stages. *See Urban One, Inc. v. Tucci*, 2018 WL 4714847, at \*14 (N.D. Ill., Sept. 30, 2018), *aff'd sub. nom. Urban One, Inc. v. Direct Media Power, Inc.*, 813 F. App'x 227 (7th Cir. 2020). "The greater the movant's likelihood of success, 'the less strong a showing' the movant 'must make that the balance of harm is in its favor.'" *Id.* (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).[11]

In granting a preliminary injunction, the court is not formally deciding the merits, but is "merely [making] a decision that the suit has enough merit—which need not be great merit—to justify an order that will freeze the situation . . . for such time as it may take to determine whether the suit is, or is not meritorious." *Ayres v. City of Chicago*, 125 F.3d 1010, 1013 (7th Cir. 1997).

---

[11] Notably, findings made at the preliminary injunction phase do not bind the trial court as the case proceeds; the major difference between the preliminary injunction phase and the merits phase is that, at the earlier juncture, a plaintiff need only show a likelihood of success on the merits, but at the later juncture actually must succeed. *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011), *cert. denied* 565 U.S. 1241 (2012).

"The likelihood of success on the merits is an early measurement of the quality of the underlying lawsuit, while the likelihood of irreparable harm takes into account how urgent the need for equitable relief really is." *Michigan v. U.S. Army Corps. of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011), *cert. denied* 565 U.S. 1241 (2012). Likelihood of irreparable harm means more than a mere possibility that harm will occur, *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21–23 (2008), although the alleged harm need not be certain to occur before a court may grant relief. *Northern Star Indus., Inc. v. Douglas Dynamics LLC*, 848 F. Supp. 2d 934, 945 (E.D. Wis. 2012) (addressing injunctive relief for Lanham Act claims).

**B.    Lanham Act**

As to the merits themselves, under section 43(a)(1)(B) of the Lanham Act, a plaintiff must show that (1) the defendant made a material false statement of fact in a commercial advertisement; (2) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (3) the statement entered interstate commerce; and (4) the plaintiff has been or is likely to be injured as a result of the false statement. *See Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381–82 (7th Cir. 2018); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999). A plaintiff must show "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).

Usually, statements alleged to be false under a Lanham Act claim are either commercial statements asserted to be literally false as a matter of fact, or claims or representations that may be true literally or may be ambiguous, but which convey a false or misleading impression, and thereby deceive consumers. *Schering Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512–13 (7th Cir. 2009) (affirming denial of plaintiff's motion for summary judgment on Lanham Act claim and explaining that a literal falsehood is indisputably false, or bald-faced, egregious, undeniable and over the top, when considered in context and with reference to the intended audience)*; Hot Wax*, 191 F.3d at 820 (affirming grant of summary judgment for defendant in false advertising claim). If the challenged statement is shown to be "literally false," Verde need not provide extrinsic evidence that any customer actually was deceived. *Hot Wax*, 191 F.3d at 820.

Pertinent here, where testing is asserted to support the representation (also known as an establishment claim), a plaintiff alleging a literal falsity either must show that the defendant's testing does not prove the proposition or must offer affirmative proof that the representation is false. *Northern Star Indus.*, 848 F.Supp.2d at 946 (citing *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1091 (7th Cir. 1994) ("If the challenged advertisement makes implicit or explicit references to tests, the plaintiff may satisfy its burden by showing that *those tests* do not prove the proposition; otherwise, the plaintiff must offer affirmative proof that the advertisement is false.") (emphasis added)). "When an advertising claim of favorable fact either expressly or impliedly

asserts that the fact is [] study-validated, the fact of the validation becomes an integral and critical part of the claim. Such a claim may therefore be proven literally false by showing only that the test asserted to validate it did not in fact do so." *C.B. Fleet Co., Inc. v. SmithKline Beecham Consumer Healthcare, LP*, 131 F.3d 430, 435 (4th Cir. 1997), cited in *Dyson, Inc. v. Sharkninja Operating LLC*, 259 F. Supp. 3d 816, 834–35 (N.D. Ill. 2017).

But as a nearby district court has noted, some circuit courts have allowed "that an establishment claim can be literally false even if the cited test or study *does* prove the proposition, if the test was 'not sufficiently reliable to permit one to conclude with reasonable certainty that [the test] established the proposition for which' it was cited." *Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963, 971 (W.D. Wis. 2010) (emphasis in original) (quoting *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62–63 (2d Cir. 1992) (in turn, citing *Procter & Gamble Co. v. Chesebrough-Pond's Inc.*, 747 F.2d 114, 118, 119 (2d Cir. 1984)); *Rhone-Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 514–15 (8th Cir. 1996); *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1138 (4th Cir. 1993)).[12]

---

[12] "The Court of Appeals for the Seventh Circuit has not had the opportunity to apply the 'sufficiently reliable' rule set forth in *Chesebrough-Pond's*, although it acknowledged the rule in *BASF*, 41 F.3d at 1089-90." *Riddell*, 724 F. Supp. 2d at 971. The *Riddell* court found that the test or study at issue there—a study concerning football player brain safety when wearing helmets during impact—was sufficiently reliable, despite the counterclaiming defendant's challenges to it, including its non-random sampling method, and a lack of information about age and condition of traditional helmets used. 724 F. Supp. 2d at 972–74. The fact of its publication over peer reviewers' objections was some evidence of reliability. *Id.* at 974.

**ARGUMENTS AND ANALYSIS**

**A.     The Threshold Phase**

###### 1.     Likelihood of Success on the Merits

To determine whether a preliminary injunction is warranted here, the Court first considers whether Verde has proven that it is likely to succeed on its Lanham Act claim. This is a "low threshold" and Verde must show only that its chance of success is "better than negligible." *Whitaker*, 858 F.3d at 1046. The Court considers "how likely" Verde is to succeed "[o]nly after [it] clears the threshold inquiries and proceed[s] to the balancing phase of the analysis." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1096.

To succeed on its false advertising claim, Verde must establish that C2R made a material false statement of fact in a commercial advertisement that deceived (or had the tendency to deceive) a substantial segment of its audience, resulting in injury to Verde. *Eli Lilly,* 893 F.3d at 381–82.

###### a.  Whether C2R made materially false statements of fact in a commercial advertisement

In its complaint and briefing, Verde asserts that C2R's advertising falls into the first category of false statements under the Lanham Act: those that are "literally false as a factual matter" (rather than those that "may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers," which fall into the second category). *N. Star Indus., Inc.*, 848 F. Supp. 2d at 946.[13]

---

[13] C2R does not contest that the statements made on its website qualify as advertising in interstate commerce, which is also a requirement of a Lanham Act claim. *See Market Track,*

Literal falsity, in this context, requires a showing that the challenged statement is unambiguous and could not reasonably be understood to mean anything different—in other words, a "patently false statement that means what it says to any linguistically competent person." *Schering-Plough Healthcare Prods., Inc.*, 586 F.3d at 513. When a statement is "literally false," a plaintiff is not required to submit evidence that anyone was misled or likely to be misled. *Id.* at 512 ("[A] representation may be so obviously misleading that there is no need to gather evidence that anyone was confused."); *see also BASF Corp.*, 41 F.3d at 1091 (affirming district court finding that a statement advertising that antifreeze "meets the Ford and GM specifications" was literally false when the antifreeze had not been tested for compliance with those specifications).

In its complaint, Verde asserts that the following representations made on C2R's website, concerning the capacity of its Rx Destroyer all-purpose products to deactivate approximate amounts of medication, are literally false:

- 5 Gallon: holds approximately 15,000 pills/patches or 500 additional oz. of liquid
- 2.5 Gallon: holds approximately 7,500 pills/patches or 160oz. of liquid
- 1 Gallon: holds approximately 3000 pills/patches or 64oz of liquid
- 64oz: holds approximately 1500 pills/patches or 32oz of liquid

---

*LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *22 (N.D. Ill. June 11, 2015), *as amended* (June 12, 2015) (accepting that defendant's comparative statements of geographic store coverage hosted on its website and shown to firms nationwide, traveled through interstate commerce).

- 6oz: holds approximately 300 pills/patches or 8oz of liquid
- 4oz: holds approximately 50 pills

AP-ECF Doc. No. 1, *Compl.*, ¶ 20 and Ex. A. [14]

C2R has since removed these capacity-by-pill representations from its website.[15] At the preliminary injunction hearing, Verde argued that C2R continues to engage in false advertising as to the Rx Destroyer's deactivation capacity—despite the website revisions—because its advertising still directs product users to fill each container 2 inches from the cap (or, as Verde's counsel put it, "to the brim"), thereby implying that the containers can deactivate the number of pills inserted up to that capacity.

In attacking the lack of support for C2R's capacity representations, Verde asserts that C2R relied on prior carbon ratios used in the Drug Buster product, without knowing upon what those capacity representations were based. Moreover, in Appendices C and D of Nowicki's capacity memo, Nowicki cited "independent studies" as support for C2R's capacity representations, but the studies' actual source or sources are not cited and given the scarcity of information in those appendices, it is, according to Verde, impossible to verify or reproduce the data therein.

---

[14] Verde's complaint also alleges that C2R's representations as to the amount of carbon and pore volume that is available in each product for drug adsorption are false, AP-ECF Doc. No. 1, *Compl.*, ¶ 33, but Verde did not press those particular allegations in its brief supporting its motion for preliminary relief, so the Court does not address them here.

[15] This does not moot Verde's request for injunctive relief. "[C]essation of an unlawful practice doesn't exonerate a defendant, since unless enjoined he might resume infringing." *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 762 (7th Cir. 2012).

Verde offered other critiques of the testing that C2R proffered to support its advertising—critiques that, in Verde's view, forecast the likelihood it will prevail at trial. Verde argues this theoretical testing, as opposed to actual product experimentation, is inappropriate, as well as scientifically incorrect. Those critiques include that Nowicki lacked expertise in analyzing pharmaceutical deactivation and, more importantly, did not test the actual Rx Destroyer product. Nowicki performed only theoretical modeling, and that modeling was flawed, in part because it did not account for the varying solubility of the array of drugs that purchasers would place into the product. Another significant flaw is that many of Nowicki's assumptions were based on pills with 5 mg of active ingredient—meaning that pills with 200 mg of active ingredient would need 40 times more pore space, a need which would exceed the stated theoretical capacity for all but the 4 oz. product. The same disparity would be true, though to a lesser extent, when comparing Nowicki's assumptions based on 30 mg active ingredient pills.

C2R relies on past and recent scientific support for its approximate capacity representations. C2R acknowledges that its initial capacity statements for Rx Destroyer were based on the representations made for Drug Buster. While one C2R witness, Russ Robers, testified that C2R did some testing in 2011 to see how many aspirin pills would "dissolve" in the different-sized bottles, another witness, Milton Dallas, testified that C2R did no deactivation testing of the Drug Buster product. Based on the distinction between simple "dissolving" in liquid versus adsorption by activated carbon as described by

Worthen, Fowler, and Mazyck, and measuring the result, the Court finds, at least on the record presented for this motion, there was no deactivation testing of Drug Buster. Moreover, Dallas testified that C2R did not test Rx Destroyer itself when it first went into production. But C2R primarily rests its defense on the theoretical modeling performed by Nowicki, after production had begun.

To meet the falsity element when the defendant's advertising explicitly or implicitly represents that tests or studies prove its product superior, plaintiff meets its burden by showing that the tests did not establish the proposition for which they were cited. *BASF Corp.*, 41 F.3d at 1090. In another Lanham Act false advertising case, *Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F. Supp. 2d 1009 (N.D. Ill. 2013), the court considered statements where defendant Bissell used the term "HEPA" and referred to a specific numerical percentage of filtration, indicating that the product met certain specific filtration standards. In granting partial summary judgment for Dyson, the court found that such a "representation by Bissell implicitly indicates that Bissell has some testing to support such a claim as to filtration performance." *Dyson*, 951 F. Supp. 2d at 1029. Bissell acknowledged it had not tested the vacuums as a whole to see whether they met the HEPA standards but based its advertising statements on certain tests conducted only on vacuum filters. The airflow rates used in testing the filters were less than the actual airflow rates created by the vacuum cleaners. In concluding that Bissell's advertising was literally false, the court found that Bissell did not have adequate testing to support its claims. *Id.* at 1031. Moreover, plaintiff Dyson had conducted its own tests of the Bissell

filters at the airflow rates of the vacuum cleaners and found the filters did not meet the advertised HEPA standards. *Id.*

Verde's expert Worthen, who performed no deactivation testing himself, analyzed the Nowicki reports and concluded that Nowicki's conclusions were unreasonable and his theoretical modeling unsupportive of C2R's deactivation capacity claims. Worthen opined that C2R wrongly relies on carbon-related references in articles having nothing to do with performance of C2R's specific product, and that C2R makes erroneous assumptions regarding adsorption science, tablet size and content.

Moreover, while Nowicki reasoned that Rx Destroyer had additional carbon pore space capacity, actual testing of the product by Fowler yielded a conclusion that Rx Destroyer has less carbon content than Nowicki believed. C2R argues that theoretical modeling is appropriate given the unpredictable drug combinations that could be placed in the product and because the drug disposal industry has no industry standard capacity test.

C2R is correct that even if Verde has affirmative evidence to undermine Nowicki's conclusions, if C2R has adduced "valid independent tests that showed its statements were true," then Verde's affirmative evidence that other tests do not prove the proposition is insufficient to establish falsity—at least when the alleged "false statement" at issue is the implicit representation that Nowicki's testing establishes C2R's capacity claims about the Rx Destroyer. *Dyson, Inc. v. Sharkninja Operating LLC,* 259 F. Supp. 3d 816, 835 (N.D. Ill. 2017). C2R makes the point that there is no industry standard test for

deactivation capacity. But when advertisements purport to rely on testing, the presence or absence of a government certified test is not relevant.

C2R says necessarily predicting capacity for drug disposal products is challenging. But that does not absolve the manufacturer—here, C2R—from fashioning truthful advertising statements, even if on relatively short notice.[16] C2R also argues that context of advertising demonstrates truthfulness. Its website directs users to its testing—so that customers themselves possess the basis for C2R's capacity claims, including Nowicki's assumptions. But its website does not direct users to Mazyck's testing. And aside from that, Fowler's and Worthen's critiques of Mayck's testing—particularly his methodology which allowed for medicine in the remaining paste to be filtered out and not accounted for in the deactivation calculation—greatly undercut the reliability of the independent testing C2R commissioned.

In *Bissell Homecare*, the defendant actually performed tests, but they were deemed insufficient to support the product representations. 951 F. Supp. 2d at 1029–32. Here, given the existing, substantial critiques of the Nowicki theoretical testing and referential analysis, without actually testing the product, Verde has shown a likelihood to succeed in proving the "literal falsity" element of its Lanham Act claim. Verde has offered probative evidence, in the

---

[16] In contrast, C2R cites a "2019 industry study" to criticize Verde's proposed testing. *See* AP-ECF Doc. No. 25, at 11–12 (citing to ECF Doc. No. 8, Lorentz Exhibit 5, at 84). This study, however—which was prepared by an LLC, "with funding from the San Francisco Department of the Environment"—has not been authenticated under Fed. R. Evid. 901, nor does it appear to be a self-authenticating report from a public agency, under Fed. R. Evid. 902(5). The Court does not consider it for purposes of this motion.

form of testing and critiques from Fowler and Worthen, that the Rx Destroyer does not deactivate drugs to the full capacity (previously) advertised on its website. To the extent that C2R's capacity advertisements implicitly represent that Nowicki's testing establishes the advertised deactivation capacity, Verde's evidence raises serious doubt as to whether the testing does, in fact, support those representations. The independent testing conducted by Mazyck, which endorses Nowicki without much foundation and which suffers from methodological flaws, does not undo this conclusion of likelihood to prevail.

### b. Likelihood of actual consumer deception

While Verde contends this remains a complaint for literal falsity, and at this stage has not submitted evidence of customer confusion, C2R argues in its sur-reply brief that Verde's argument evolved into a claim that the website representations are misleading.

Given the Court's findings as to Verde's likely—which here, means simply more than negligible—chance of success on its literal falsity claim, the Court declines to assess the merits of any potential alternate argument that C2R's advertisements are misleading, and need not consider any evidence of consumer deception.

### 2. Irreparable Harm

As noted above, to succeed on its Lanham Act claim, Verde also must demonstrate that it "has been or is likely to be injured as a result of the false statement." *Eli Lilly*, 893 F.3d at 382. This necessarily includes an element of causation, and "requires proof of an injury to a commercial interest in sales or

business reputation proximately caused by the defendant's misrepresentations." *Id.* at 383. Moreover, to obtain a preliminary injunction, Verde must show that, without injunctive relief, it will suffer irreparable harm. "[H]arm is considered irreparable if it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Whitaker*, 858 F.3d at 1045 (quoting *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1089); *see also Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013) ("[F]or the grant of a preliminary injunction to be proper, the harm to the plaintiff also must be judged irreparable—meaning not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor. For if the harm can be fully repaired in the final judgment, there is no reason to hurry the adjudicative process.") (internal citations omitted).

### a. No presumption of irreparable harm

Verde and C2R disagree over whether irreparable harm must be presumed in this case. Verde begins by relying on the "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss," citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992) (collecting cases) and *Promatek Indus., Ltd v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002), *as amended* (Oct. 18, 2002). C2R disputes that Verde benefits from any presumption of irreparable injury by virtue of its Lanham Act claim, at least since the United States Supreme Court decided *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006),

and also citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (in an environmental protection case, explaining that "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.") (citations omitted).[17]

C2R is correct that the Supreme Court discarded the notion—at least for permanent injunction cases under the Patent Act—that there is a presumption of irreparable harm when a patent infringement plaintiff seeks injunctive relief. *eBay Inc. v. Mercexchange, L.L.C.*, 547 U.S. at 394. The Court's holding may well apply beyond patent cases: "We hold only that the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.* While the Seventh Circuit Court of Appeals has not held expressly, since *eBay* issued, that false advertising cases under the Lanham Act are subject to the full five-factor framework that governs awards of injunctive relief, *sans* any *Promatek* presumption of irreparable harm, it is likely it would do so if asked. *See, e.g., Kraft Foods Grp. Brands LLC*

---

[17] C2R adds that even if the presumption applies, it applies to only false advertising claims for comparative advertising, which did not occur here. *See* AP-ECF Doc. No. 18, at 18 (citing *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (11th Cir. 2008) and *Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 162 (2d Cir. 2007). The Court agrees that C2R's challenged statements do not amount to comparative advertising between its product and Verde's. While at times Verde seems to argue that C2R's advertising was comparative, or that these parties are the only two producers of drug disposal systems in the marketplace, the evidence they offer shows otherwise, and the text of C2R's challenged statements do not mention or allude to Verde.

*v. Cracker Barrel Old Country Store, Inc.,* 735 F.3d 735, 740–741 (7th Cir. 2013) (in affirming grant of preliminary injunction in trademark case, appellate court undertook full analysis, without mention of any presumption of irreparable harm); *see also LigTel Commc'ns, Inc. v. Baicells Techs., Inc.,* __ F. Supp. 3d __, 2020 WL 1934178, at *11 (N.D. Ind., April 21, 2020) (explaining that Seventh Circuit has held that "*eBay* governs a motion for preliminary injunction in a copyright case," and that other district courts within the Circuit have expressed doubt as to whether the Seventh Circuit would reach a different conclusion in cases arising under the Lanham Act) (quoting *Flava Works, Inc. v. Gunter,* 689 F.3d 754, 755 (7th Cir. 2012) (concluding that district court erred in presuming irreparable injury in granting preliminary injunction based on alleged copyright infringement: "the Supreme Court's subsequent decision in *eBay* . . . made clear that there is no such presumption; and though that was a case about patents rather than copyrights and about permanent rather than preliminary injunctions, we are persuaded . . . that *eBay* governs a motion for a preliminary injunction in a copyright case, as well")); and *Market Track, LLC v. Efficient Collaborative Retail Mktg., LLC,* No. 14 C 4957, 2015 WL 3637740, at *23 (N.D. Ill. June 11, 2015), *as amended* (June 12, 2015) (in light of *eBay,* declining to apply blanket presumption of irreparable harm in false advertising claim under Lanham Act).

True, other district court decisions since *eBay,* cited by Verde, have applied the presumption to false advertising cases. Those include, at first blush: *MillerCoors, LLC v. Anheuser-Busch Cos., LLC,* 385 F. Supp. 3d 730,

757, 758 n.25 (W.D. Wis. 2019); *Eli Lilly & Co. v. Arla Foods Inc.*, No. 17-C-703, 2017 WL 4570547, at *10 (E.D. Wis. June 15, 2017); and *Northern Star Indus., Inc.*, 848 F. Supp. 2d at 949–50 ("[T]he Seventh Circuit has recognized a presumption that injuries arising from violations of the Lanham Act are irreparable, even absent a showing of business loss."). But none of these cases represent the wholesale endorsement of the *Abbott Labs* and *Promatek* presumption that Verde would like. For example, in *MillerCoors*, after the defendant objected to the presumption based on *eBay*, the court noted that the Seventh Circuit hadn't taken a position, and further found that the plaintiff had submitted sufficient evidence of irreparable harm without applying the presumption. 395 F. Supp. 3d at 758 n.25. And the *Eli Lilly* court apparently was not asked to discuss the effect of *eBay* on false advertising claims as it made no mention of the case. Similarly, the *Northern Star* court did not address *eBay*, relying instead on the parties' citation to *Promatek*, 848 F. Supp. 2d at 813 and *Abbott Labs.*, 971 F.2d at 7.

In sum, the *Kraft Foods* case, along with *Flava Works*, are the best indicators that the Seventh Circuit would, when asked, adopt the reasoning of *eBay* and undertake the full five-factor analysis for preliminary injunctive relief, without applying a presumption of irreparable harm to false advertising cases. But certainly, all of the cases cited above recognize the particular difficulty in assessing harm when a competitor engages in false advertising. And so, Verde must show that it is likely to be irreparably harmed by C2R's conduct if no preliminary injunction were to issue.

### b. The harm shown

Verde asserts that it has sustained and will continue to sustain injuries in the form of lost sales and reputational harm due to C2R's likely false advertising. In support, Verde makes the following factual claims:

- Verde and C2R are direct competitors in the drug disposal product space and have made sales to at least two dozen of the same customers.

- The effectiveness and the cost of drug disposal products are two of the most important factors in the purchasing decision.

- C2R's capacity representations are critical to both the efficacy and cost factors considered by customers.

As "evidence" to support these claims, Verde refers to (1) Jason Sundby's declaration (more on that below); (2) testimony from Milton Dallas (in which Dallas concedes that he has "encountered Deterra as a competitor" in selling the Rx Destroyer line of products); (3) a chart outlining the customer overlap between Verde and C2R, which shows that the companies sold to 25 of the same customers between 2015 and 2019 (resulting in over $6 million in sales to C2R); (4) C2R promotional materials that Verde describes as "includ[ing] product capacity in conjunction with price"; and (5) several emails between C2R's business development director and current or prospective customers, which Verde alleges "reflect the cost and capacity analyses undertaken before purchasing drug deactivation products" and discuss the value of C2R's product on a per-pill basis. *See* AP-ECF Doc. No. 118, at 11–12.

### i. Sundby's declaration

Sundby testified, "based upon [his] firsthand observations," that the drug-deactivation market as a whole is harmed by C2R's likely false advertising, because, when the Rx Destroyer products do not perform as advertised, customers lose faith in the entire market—and in particular, products that use activated carbon. This loss of faith in the market equates to a loss in current and potential customers for Verde. In addition, "based on [Sundby's] experience," Verde is harmed by C2R's false capacity representations because they make Verde's product appear less cost-efficient in comparison, and customers purchase Rx Destroyer over Deterra because the cost-per-pill is lower due to the capacity representations. C2R assailed the admissibility of Sundby's testimony, though providing no direct legal support for the challenge.

Sundby's declaration does not identify any specific facts like customer survey data, or sales reports, to support his conclusion that C2R's advertising has caused Verde to lose customers. If his conclusion were based on statements made to him by customers, those statements would be inadmissible hearsay. "Courts in this circuit consistently have rejected vague summaries of hearsay statements by unidentified consumers." *Bobak Sausage Co. v. A&J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 520 (N.D. Ill. 2011) (citing cases)*; cf. Grove Fresh Distributors, Inc. v. New England Apple Prod. Co.*, 969 F.2d 552, 556 (7th Cir. 1992) (testimony regarding statements made by former customers of competitor to orange juice manufacturer that they switched to

manufacturer's brand of orange juice because it was cheaper could be admitted under Fed. R. Evid. 803(3)—exception for then existing mental condition—for the limited purpose of showing motive and intent); *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 251–52 (3d Cir. 1999) (hearsay statements of customers can be admitted under Fed. R. Evid. 803(3) to show the reason for lost business—the customer's motive in purchasing from a competitor—but not the actual fact that a plaintiff lost business to a competitor).

Verde argues, however, that as an experienced CEO and business owner, Sundby "has adequate experience in the market to testify about the characteristics of the market and the importance of various factors to the market participants" and suggests that his testimony should be admissible under Fed. R. Civ. P. 701, citing *Compania Administrador de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 533 F.3d 555, 560 (7th Cir. 2008) ("[A] business owner or officer is allowed to testify without being qualified as an expert only because that testimony is tied to his or her personal knowledge.") (citing Fed. R. Evid. 701, advisory committee notes to 2000 amendments). The Rule itself provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701 (2000).

Sundby's testimony does not meet this standard. According to his declaration, Sundby's opinions as to market harm and customer loss are based on his "firsthand experience in the market" serving as CEO for Verde since 2015, through which he has developed "a detailed understanding of what customers typically expect and rely on with respect to the products at issue in this lawsuit." This vague statement, without more factual support, does not establish that Sundby's opinions are based on "particularized knowledge he possesses due to his position within the company" or his "participation in the day-to-day affairs of [his] business." *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 862 (7th Cir. 2009); *see also R.I. Spiece Sales Co. v. Bank One, N.A.*, No. 1:03-CV-175-TS, 2005 WL 3005484, at *1 (N.D. Ind. Nov. 9, 2005) (individuals with "special knowledge of the business and its operations may [] testify as to the facts of the business that underlie profit expectations under Federal Rule of Evidence 701 without qualifying as experts," but "may not make inferences from the data")).[18]

---

[18] The case Verde cites in support of its "lay opinion" argument, *Compania*, does not help Verde. In that case, the court disallowed a witness' proposed lay opinion testimony because the witness' "attempt at valuation was not based on any knowledge obtained through his special relationship with the items in question; instead, he simply looked at a list of items provided by [plaintiff], and he estimated their value based on his extensive experience purchasing and selling the type of goods at issue." 533 F.3d at 560. The court observed that such testimony is the type "traditionally provided by an expert," and "could have been offered by any individual with specialized knowledge of the [relevant] market." *Id.* (internal quotation marks omitted); *see also Smart Marketing Group, Inc. v. Publications Int'l, Ltd.*, No. 04 C 146, 2014 WL 625321 (N.D. Ill. Feb. 18, 2014) (declining to admit a business president's testimony under Rule 701, where his answers were related to renewal rates based on his experience in the industry, and not on his personal knowledge of specific programs at issue); *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, No. 1:11-CV-190, 2014 WL 554565, *3-6 (N.D. Ind. Feb. 11, 2014) (witness' testimony was not admissible as lay opinion testimony because he was offering loss projections, which are more properly the subject of expert testimony, and his opinion was based on information supplied by others, not his personal knowledge; although a witness may have sufficient personal knowledge to offer a lay opinion as to losses of existing customers, and

In short, Sundby's testimony as to customer behavior and Verde's business loss due to C2R's advertising is, on this record, only speculation.[19]

### ii. Other evidence

Verde also relies on testimony from Dallas conceding that Deterra is a competitor of Rx Destroyer,[20] as well as a chart showing customer overlap between Verde and C2R. But the fact that Verde and C2R are competitors is not proof of harm. In support of its argument to the contrary, Verde relies on cases including *Abbot Labs* and *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011). But Verde's heavy reliance on these cases is misplaced. *Abbot Labs* involved a case of comparative advertising, where courts routinely conclude that the nature of the conduct at issue—comparisons casting the plaintiff's product in an unfavorable light—necessarily results in harm. *See Abbott Labs,* 971 F.2d at 16 (finding "no doubt" that false comparisons between two products "necessarily diminishes [the competing product's] value in the minds of the consumer"); *see also Mkt. Track, LLC*, 2015 WL 3637740, at *22 ("[D]isparaging false statements about a competitor's

---

the corresponding loss of profits, any opinions as to future sales to future customers require specialized knowledge).

[19] C2R counters Sundby's declaration with testimony from Milton Dallas that the cost-per-pill analysis is only one of several factors customers consider and, even if Verde could prove it lost sales to C2R instead of another competitor, the Rx Destroyer has other qualities that could influence a customer to purchase it instead of Deterra, including because it is multi-use and ready-to-use. Dallas's testimony suffers from the same hearsay and foundational problems as Sundby's, so the Court's analysis on admissibility of his testimony, at this juncture, would be the same.

[20] In doing so, Verde ignores Dallas' testimony that Deterra is not the primary competitor for Rx Destroyer, and that it is "rare" to hear the name Deterra in the industry for the markets that C2R approaches to sell its Rx Destroyer line.

product, especially when the relevant market is nearly entirely occupied by two competitors, harms the competitor's goodwill and competitive position"). This is not a case of express comparative advertising. And the current record does not reflect that the relevant market is "nearly entirely occupied by two competitors."

Nor is *CJ Prod. LLC* analogous. In that case, the plaintiff toy company sued a competitor not only for false advertising, but also copyright infringement and trademark infringement, based on the competitor's sale of plush toys substantially similar to the plaintiff's toys. In concluding that the plaintiff had established irreparable harm on its false advertising claim, the court did not—as Verde seems to suggest—base its decision solely on the fact that, as competitors, "the sales of one party's products would certainly impact the sale of the other party's product." Rather, the court found that the competitor's false advertising was "clearly an attempt to usurp the brand recognition built by plaintiffs over many years through considerable effort and a multi-million dollar marketing campaign," and that "flooding the market with counterfeit products will not only result in lost sales, but perhaps more importantly, it will impair [the] plaintiffs' reputation" given the high likelihood that consumers would confuse the two products. 809 F. Supp. 2d at 149 (internal quotation marks omitted). The court added: "Since proving the 'loss of sales due to infringement is . . . notoriously difficult,' an injunction is the proper vehicle by which to prevent further damage." *Id.* Here, C2R is not alleged to have engaged in activity designed to confuse customers into thinking

that Rx Destroyer is the same product as Deterra, and thus the same "logical causal connection" between the advertising and the parties' sales positions does not exist.

For the same reason, Verde's reliance on *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.,* No. 14 C 7424, 2015 WL 3633987, at *12 (N.D. Ill. June 10, 2015)—in asserting that evidence of actual lost sales is not necessary to demonstrate irreparable harm—is misguided. That case involved an infringing trademark which, by its nature, detracts from the value of the mark with which it is confused. The court in *Nat'l Fin. Partners* observed that the Lanham Act is "designed to redress 'the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill'" and "[t]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods.'" *Id.* (quoting *Abbott Labs,* 971 F.2d at 16; *Processed Plastic Co. v. Warner Commc'ns, Inc.,* 675 F.2d 852, 858 (7th Cir. 1982)). In finding that the plaintiff had sufficiently shown it would suffer irreparable harm in the absence of an injunction, the court pointed to (1) the substantial amount of money the plaintiff had spent in marketing its trademarked logo—indicating the mark had significant economic value as a source identifier, and thus "[a]ny infringement that impedes that identifying function will cause significant harm"—and (2) the compelling evidence of consumer confusion, noting "[b]ecause the damage to [the plaintiff's] good will and reputation caused by this confusion is inherently intangible and impossible to quantify, the harm is irreparable." *Id.* Again, this

is not a situation where C2R is attempting to convince consumers that its allegedly inferior product is Verde's Deterra product, or to capitalize on Verde's marketing of Deterra. Nor, at this stage, has Verde offered evidence of customer confusion.

In addition, the record does not establish a small (or "two-player") market, as Verde suggests. *See* AP-ECF Doc. No. 118, at 10–11 (referring to the "size of the market" and comparing this case to *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 260–61 (2d Cir. 2014), where the market comprised only two competitors). While C2R's original advertising, at least as reflected in Verde's 2014 cease-and-desist letter, made comparisons to Verde's product, more recent evidence including Verde's own documents show that Fowler, in assessing the competition in the marketplace, found at least four other competitors of Deterra across the U.S. and U.K., including "Drug Dispose-all" and "Pill Catcher." Harm to Verde due to C2R's likely false representations, based only on Verde's status as a market competitor, cannot be inferred. *Cf. Merck*, 760 F.3d at 259–61 (finding that where "a plaintiff has met its burden of proving *deliberate deception* in the context of a *two-player market*, it is appropriate to utilize a presumption of injury," and distinguishing from non-comparative advertising cases, where "the injury 'accrues equally to all competitors; none is more likely to suffer from the offending broadcasts than any other,'" meaning that a plaintiff must offer "'some indication of actual injury and causation' . . . to ensure that [the] plaintiff's injury is not speculative") (emphasis added).

In sum, Verde's inferences and assertion of harm based on evidence that Verde and C2R compete in the same market and have some of the same customers, is insufficient at this point to show causation.

The only other evidence Verde relies on is C2R promotional material and customer emails, which, according to Verde, show that (1) customers consider effectiveness and cost of drug disposal products in making purchasing decisions, and (2) C2R's capacity representations are critical to those considerations. This, too, fails to establish a causal link between C2R's advertising and any harm to Verde. C2R's promotional materials merely advertise the Rx Destroyer's capacity in conjunction with price; there is no direct comparison to Deterra or to any other competing product. Likewise, none of the customer emails make any reference or comparison to Verde or to its product Deterra.

This lack of evidence cannot be remedied through the opinion of Verde's expert, David Gorowsky. Gorowsky opined that Verde's financial success, despite C2R's actions, does not discount ongoing irreparable harm. Although he actively discounted the testimony of C2R's expert, Thomas Britven, he failed to introduce any alternative evidence of harm. Instead, he categorically concluded that C2R's advertising gives rise to a false comparison between Verde and C2R's products and their deactivation capacities, and one could infer that any customers who knew of both companies would purchase more from Verde absent C2R's advertising. For the reasons previously explained, this inference, in light of the evidence at this stage, is too great a leap.

On this record, Verde has failed to establish that there is more than a mere "possibility" that harm will occur. *See Winter*, 555 U.S. at 22; *Michigan*, 667 F.3d at 782 (findings at this stage do not bind the trial court as case proceeds). Even assuming, however, that Verde had demonstrated harm was likely to occur, Verde's delay in seeking injunctive relief undercuts any finding of irreparable harm.

### c. Delay

C2R not only disputes Verde's substantive argument about harm, but makes a secondary rebuke to Verde's claim of irreparable injury. C2R argues that Verde waited too long to file the instant motion.

The Seventh Circuit instructs that a long, unexplained delay in seeking relief can call into question "how urgent the need for [preliminary] equitable relief really is." *Michigan*, 667 F.3d at 788 (denying injunctive relief on public nuisance claim). When a defendant asserts that the plaintiff has unduly delayed in pursuing a preliminary relief, the court generally measures the pertinent span from the time the plaintiff discovers the trademark infringement (or false advertising) until the injunctive relief motion is filed. *See USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 438 (N.D. Ill. 2019). At least one court has measured the pertinent span from the time plaintiff first sent its cease-and-desist letter until filing its motion. *See Life After Hate, Inc. v. Free Radicals Project, Inc.,* 410 F. Supp. 3d 891, 910 (N.D. Ill. 2019). Here, that time frame would be June 2014 to January 2020, or 67 months.

In *Redbox Automated Retail, LLC v. Xpress Retail LLC,* 310 F. Supp. 3d 949 (N.D. Ill. 2018), the court considered an 18-month delay from the time plaintiff learned of defendant's infringement and false advertising until the time plaintiff brought its motion for preliminary injunction as evidence undercutting plaintiff's asserted irreparable harm. The *Redbox* court declined to "manufacture a sense of urgency that [wa]s not supported by plaintiff's own conduct." *Id.* at 955–56 (internal quotation marks omitted). The *Redbox* court also cited a recent survey of trademark decisions which concluded that "if the delay is greater than 12 months, preliminary injunctive relief is usually denied." J. Thomas McCarthy, 6 *McCarthy on Trademarks & Unfair Competition* § 31:31 (citing Sandra Edelman & Fara S. Sunderji, *Delay in filing Preliminary Injunction Motions: 2015 Edition*, 105 Trademark Rep. 1012 (2015)).

There can be acceptable reasons for delay. Some courts weighing a pause in seeking injunctive relief have considered intervening settlement talks as a reasonable explanation for the gap. *See Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 169 (3d Cir. 2000) (ruling that 15-month delay did not negate plaintiff's claim of irreparable harm in false advertising claim when the delay was "attributable to [settlement] negotiations between the parties"). In a patent infringement case, *InVue Sec. Prod. Inc. v. Vanguard Prod. Grp., Inc.*, No. 8:18-CV-2548-T-33SPF, 2019 WL 4671143 (M.D. Fla. July 1, 2019), *report and recommendation adopted*, No. 8:18-CV-2548-T-33SPF, 2019 WL 4673755 (M.D. Fla. Aug. 15, 2019), the plaintiff waited 18 months after first notifying defendant of the infringing patents, and then waited

seven months after filing its complaint to file the motion for preliminary injunction. *Id.* at *6. The plaintiff asserted that the delay was based on negotiations with the defendant about the latter's position on patent invalidity, and pointed out that it filed the motion for injunctive relief only 25 days after the defendant conceded in discovery the validity of six of the patents in suit. In determining whether this was a "good explanation" that would justify the significant delay, the *Invue* court considered cases where the course of litigation discovery did not support the delay in seeking injunctive relief. *Id.* (citing *Regions Bank v. Kaplan*, No. 8:16-cv-2867-T-23AAS, 2017 WL 3446914, at *3 (M.D. Fla. Aug. 11, 2017) ("Although reviewing the 13,000 documents and conducting 'due diligence' undoubtedly required some time, [plaintiff] fails to explain persuasively the protracted delay [of three months from bringing the action] in requesting a preliminary injunction, which delay belies [plaintiff's] claim of an imminent and irreparable injury."); *Capital Mach. Co. v. Miller Veneers, Inc.*, No. 1:09-cv-702-JMS-TAB, 2010 WL 3000769, at *1 (S.D. Ind. July 28, 2010) (insufficient justification for the delay when the plaintiffs waited over a year into the litigation before requesting a preliminary injunction, claiming they needed to conduct discovery before they could be sure they had sufficient evidence to request a preliminary injunction, but didn't request expedited discovery, "unlike many other litigants who are concerned about truly immediate and irreparable injury")). The court then pointed to the defendant's assertion that, had the plaintiff acted more promptly, the defendant would have ceased sales of its allegedly infringing product and

already placed its new, non-infringing version of the product in the market. *Id.* at *7. In the circumstances, the court concluded that the plaintiff's delay in seeking a preliminary injunction severely undermined a finding of irreparable harm. *Id.*

Verde responds that while it had experimental evidence undermining C2R's capacity claims prior to filing suit, it had not yet conducted any discovery. According to Verde, it moved promptly but prudently only after completing that discovery, *see* AP-ECF Doc. No. 42, at 12 (citing *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 692 F. Supp. 2d 805, 822 (N.D. Ohio 2010) ("Bettcher contends it waited to request an injunction until testing of Bunzl's blades had confirmed its theory of liability. This was prudent. . . . In these circumstances, the timing of Bettcher's request for injunctive request was reasonable . . . .")). Verde also argues that it was not in a position at the time of its earlier testing to expend significant funds on legal fees in pursuit of litigation.

The Court finds that Verde waited longer than prudence can bear to seek injunctive relief. Certainly, its June 2014 cease-and-desist letter to C2R should not have "lulled" the defendant into a view that Verde considered C2R's advertising without scientific basis to be accurate, at least for some period of months. *See Ty, Inc. v. v. Jones Grp., Inc.*, 237 F. 3d 891, 903 (7th Cir. 2001) ("Whether the defendant has been lulled into a false sense of security or had acted in reliance on the plaintiff's delay influences whether [courts] will find that a plaintiff's decision to delay in moving for a preliminary injunction is

acceptable or not.") (internal quotation marks omitted). But Verde had the benefit of its own continued testing by Fowler beyond 2014 into 2015, 2016, 2018 and 2019, and still did not seek a preliminary injunction.

True, the filing of Verde's complaint for patent infringement and false advertising in March 2018 was notice to C2R that its theory of harm was "live." The testimony of Dallas about C2R's reliance on theoretical modeling instead of actually testing its own Rx Destroyer products came in late 2019, and the motion for a preliminary injunction was filed just two months thereafter. But the span of time during which Verde at least possessed test results discrediting C2R's website statements is far beyond any duration accepted by courts as reasonable and could well have allowed C2R to relax its defenses and continue its advertising expenditures. Indeed, C2R obtained the (flawed) Nowicki analyses in early 2015, eight months after Verde's letter challenged C2R's advertising as lacking an evidentiary basis. *Life After Hate, Inc.*, 410 F. Supp. 3d at 910 ("14 months is certainly pushing the limit"); *Redbox*, 310 F. Supp. 3d at 953-54 (unexplained 18-month delay in filing suit precluded finding of irreparable harm); *Benisek v. Lamone*, 138 S. Ct. at 1944 (concluding, that while some state officials asserted legislative privilege which delayed discovery, plaintiffs in redistricting case could have sought injunctive relief years earlier and balancing of equities weighed against granting relief). Verde's assertion that it could not afford to have brought suit earlier is an internal cost-benefit assessment Verde made, and when weighed against the amount of time

between the first testing in 2014 and the motion in 2020, does not justify the substantial delay in seeking a preliminary injunction.

For all of these reasons, Verde has not established that it will suffer irreparable harm without a preliminary injunction.

### 3. No Adequate Remedy at Law

The last prong of the "threshold" phase requires the Court to consider whether Verde has shown that it has no adequate remedy at law—in other words, that "damages would not rectify the harm complained of." *USA-Halal Chamber of Commerce, Inc.*, 402 F. Supp. 3d at 437; *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) ("In saying that the plaintiff must show that an award of damages at the end of trial will be inadequate, we do not mean wholly ineffectual; we mean seriously deficient as a remedy for the harm suffered."). Monetary damages alone may be insufficient when the nature of the plaintiff's loss makes damages very difficult to calculate—for example, when the alleged injury is loss of goodwill. *MillerCoors*, 385 F. Supp. 3d at 757–58 ("[T]he difficulty in assessing the damages associated with a loss of goodwill supports finding that the plaintiff lacked an adequate remedy at law.") (citing cases).

Verde asserts that damages are inadequate because it suffered injury to its goodwill due to C2R's false advertising, and such losses are impossible to quantify in monetary terms. C2R disagrees. According to C2R's financial expert, Thomas Britven, any losses Verde suffered may be remedied with quantifiable monetary damages, which can be calculated based on Verde's

financial performance using standard economic principles. Verde's expert, Gorowsky, countered that Verde's actual financial results do not show transactions that were lost because of C2R's advertising, and therefore financial reports are inadequate to show the full measure of the harm Verde has suffered.

Although Verde is correct that injury to reputation and goodwill typically are incalculable and thus a remedy at law is inadequate, as the Court has previously concluded, Verde has failed to establish, on this record, that this type of harm is likely due to C2R's advertising. Verde therefore has not shown that it lacks an adequate remedy at law.

## B.    The Second Phase

### 1.    Balancing of Harm

In its request for a preliminary injunction, Verde seeks both to enjoin C2R from continuing to make false statements about its product capacity, and to require C2R to engage in corrective advertising. While the Court already has concluded that Verde has not met, on this record, the irreparable harm element, for the sake of completeness it will discuss briefly the parties' arguments on balancing the harms and public interest.

As to the first form of relief, neither party asserts that this would impose an undue hardship on C2R; indeed, C2R has removed from its website the likely false statements cited in Verde's complaint. *See, e.g., Mkt. Track, LLC*, 2015 WL 3637740, at *23 (because the defendant had voluntarily ceased using the offending advertisement, "an injunction against false comparisons of data

coverage would be an insignificant burden," because the defendant "would still remain free to continue to operate its core business and to advertise its other perceived advantages over" the plaintiff). The Court recognizes Verde still asserts the remaining capacity instructions constitute a false claim.

As to the request for corrective advertising, C2R argues that it would have to expend "substantial costs" as a bankrupt estate if such relief were ordered, and also that injunctive relief now would "inflict substantial reputational harm that could not easily be undone." *See* AP-ECF Doc. No. 25, at 19 (citing *Healthpoint Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 869 (W.D. Tex. 2001) ("Deferring corrective advertising until the decision on the merits avoids the unnecessarily harsh and possibly confusing possibility of multiple corrective advertisements.")).

Verde concedes that C2R likely would experience hardship in rolling out corrective advertising measures, but asserts that the hardship to Verde would be greater if such relief were not ordered, because Verde's goodwill will continue to erode while C2R wrongfully attracts customers away. In addition, says Verde, it is not a hardship for C2R to obey the law. *See Mkt. Track, LLC*, 2015 WL 3637740, at *23 ("[The defendant] has no right to make false statements in its advertising, and enjoining it from engaging in unlawful behavior is no hardship at all.").

At this stage, the balance of harms, even if the Court had found that Verde would be irreparably harmed without injunctive relief, tips toward C2R. While the Court has found on this record that Verde is likely to succeed on the

merits of its false advertising claim, C2R, a debtor in bankruptcy, has taken several steps since 2015 to mitigate harm to Verde (if not to other manufacturers in the market). C2R deleted its disparaging comparative advertising after Verde sent its cease-and-desist letter in 2014, and likely, though not expressly admitted, as a result of this litigation C2R modified its website claims about capacity earlier this year. Nonetheless, Verde's request that C2R now go further and issue affirmative corrective statements to its customers would not only involve cost but likely cause it to lose customers. The evidence of record shows that Verde and C2R have some but not total customer overlap. In contrast, Verde has not yet made the case for irreparable harm, the current website statements are not comparative, and a fuller record can be made at trial. The balance tips against an injunction now.

### 2. The Public Interest (Effects on Non-parties)

Verde argues that C2R's misrepresentations have led and continue to lead purchasing customers to think that its product can deactivate more drug waste than it can. As Worthen testified, Rx Destroyer containers are placed in landfills and other final disposal areas with some amount of drug still active, and those amounts can leach into the environment. Verde asserts that it is this public interest which demands a preliminary injunction.

C2R disagrees as to all premises—it stands behind its (revised) advertising as to deactivation capacity and denies that un-deactivated drugs are leaching from Rx Destroyer containers into the environment. It faults

Verde's assertions of environmental harm as being unsupported by any evidence.

The Court agrees that, at this juncture, any harm to the environment or public safety is not of a degree warranting a preliminary injunction. While the Court has found it likely that Verde will prevail on the merits of its false advertising claim, meaning that Rx Destroyer products do not deactivate to the full capacity asserted, it is still a conceptual leap, based on the current tangential record, to conclude that the public has an interest in enjoining C2R's advertising now, based on harm to the environment. For instance, the Court notes that the DEA regulations and fact sheet which C2R asked Nowicki to review, 21 C.F.R. § 1317 et seq. (2014), *see* AP-ECF Doc. No. 26-14, referenced a DEA website containing an array of information about pharmaceutical disposal options. *See* http://www.DEAdiversion.usdoj.gov. Included on that site, even today, not only are there regulations and instructions for disposal container manufacturers such as Verde and C2R, but also instructions from the DEA and from the EPA (U.S. Environmental Protection Agency) for individuals who may wish to dispose of used, or unused medications at home. *See*

https://www.deadiversion.usdoj.gov/drug_disposal/index.html. These instructions describe how individuals may dispose of unused medicines in their household trash, and should only flush expired or unwanted medications down the toilet if the label or accompanying patient information specifically instructs them to do so.

Verde, in its opening brief, pointed to a Wisconsin DNR website which suggests that products like C2R's and Verde's are not as effective as they might be. The cautionary note appearing on the Wisconsin DNR site, while admissible as a public record under Fed. R. Evid. 902—*see Qiu Yun Chen v. Holder*, 715 F.3d 207, 212 (7th Cir. 2013) (a document posted on a government website is presumptively admissible if government sponsorship can be determined by visiting website)—does not, as Verde argues, solidify that C2R is the cause of irreparable harm to Verde and other producers in the market, or consequently, to the public and the environment. Likewise, when Verde—via Sundby's declaration—points to news articles about proposed national or recent state legislation, it still doesn't form a direct enough evidentiary link to C2R's overstated capacity claims. Indeed, the fact that the DNR and DEA websites continue to provide instruction for consumers to place their own unused medications in the trash, even as a least-preferred option, mitigates the public interest in injunctive relief against C2R at this stage.

The fact that the Court does not find a solid link, in this record, between years-old calls for legislative solutions, current federal agency instructions, multiple consumer articles decrying in-home tragedies with unused medications, and Verde's expert's critique of C2R's likely over-filled products, is not meant to minimize some real, multi-faceted problems our drug-flooded society faces. But preliminary injunction authority is far-reaching, and "never to be indulged except in a case clearly demanding it." *Girl Scouts of Manitou,*

549 F.3d at 1085. Here, the demand is not quite clear enough, and the Court must stay its hand.

## CONCLUSION

For the foregoing reasons, Verde's motion for a preliminary injunction will be denied. The Court will enter a separate order consistent with this decision.


Dated: October 6, 2020

By the Court:

Beth E. Hanan
United States Bankruptcy Judge